(C.D. 2482)

## G. F. CHURCH & COMPANY *v.* UNITED STATES

United States Customs Court, First Division

(Decided October 7, 1964)

*Tompkins & Tompkins* (*Allerton deC. Tompkins* of counsel) for the plaintiff. *John W. Douglas*, Assistant Attorney General (*Bernard J. Babb*, trial attorney), for the defendant.

Before OLIVER and WILSON, Judges

WILSON, Judge: The merchandise in the case at bar consists of a concentrated fruit flavoring extract containing 29.5 per centum alcohol by weight called "Sinalco Seele," represented by plaintiff's exhibit 1. The product in question is used as one of the base flavoring ingredients to make a soft drink known as "Sinalco" (R. 8). It was classified with duty as a fruit flavoring extract, containing over 20 per centum but not over 50 per centum of alcohol, at the rate of 9 per centum ad valorem, plus 15 cents per pound under paragraph 24 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, plus taxes at $10.50 per wine gallon under the provisions of section 5001 of the Internal Revenue Code.

Plaintiff herein, advancing the contention that the imported product is not fit for beverage purposes, claims the merchandise properly dutiable at 30 cents per pound and 9 per centum ad valorem under said paragraph 24 of the tariff act, as modified, as a fruit flavoring extract, and that the internal revenue tax is not applicable.

The pertinent provisions of paragraph 24 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, read as follows:

Flavoring extracts, and natural or synthetic fruit flavors, fruit esters, oils and essences, all the foregoing and their combinations when containing alcohol:

\*     \*     \*     \*     \*     \*     \*

    Containing over 20% but not over 50% of alcohol_____ 30¢ per lb. and 9% ad val.

\*     \*     \*     \*     \*     \*     \*

    *Provided*, That, whenever the foregoing products are subject to a Federal tax on the alcoholic content measured in whole or in part by the rate of an internal Federal tax imposed in respect of the alcohol contained in the like domestic products, the specific parts of the foregoing rates shall be reduced from 15, 30, and 60 cents to 7½, 15, and 30 cents, respectively.

Section 5001 and section 5002 of the Internal Revenue Code of 1954, as amended, provide:

§ 5001. Imposition, rate, and attachment of tax

    (a) Rate of tax.—

        (1) General.—There is hereby imposed on all distilled spirits in bond or produced in or imported into the United States an internal revenue tax at the rate of $10.50 on each proof gallon or wine gallon when below proof and a proportionate tax at a like rate on all fractional parts of such proof or wine gallon. On and after July 1, 1959, the rate of tax imposed by this paragraph shall be $9 in lieu of $10.50.

        (2) Products containing distilled spirits.—All products of distillation, by whatever name known, which contain distilled spirits, on which the tax imposed by law has not been paid, shall be considered and taxed as distilled spirits.

§ 5002. \* \* \*

\*     \*     \*     \*     \*     \*     \*

    (6) Distilled spirits.—

        (A) General definition.—The terms "distilled spirits", "alcoholic spirits", and "spirits" means that substance known as ethyl alcohol, ethanol, or spirits of wine, including all dilutions and mixtures thereof, from whatever source or by whatever process produced and shall include whisky, brandy, rum, gin, and vodka.

Title 26, Code of Federal Regulations (revised 1956), provides: Section 251.44:

Compounds and preparations, other than those specified in § 251.43 containing distilled spirits, which are fit for beverage purposes, in customs bonded warehouse or imported into the United States are subject to internal revenue tax at the rates applicable to distilled spirits. Compounds and preparations containing fortified or unfortified wine, but no distilled spirits, which are fit for beverage purposes and which are sold as wine, are subject to internal revenue tax at the rates applicable to wine.

As stated by the parties to this controversy, the issue in this case is whether or not the merchandise under consideration is fit for beverage purposes (R. 3).

The record herein consists of the testimony of two witnesses for the plaintiff and three exhibits received in evidence, as follows: Plaintiff's exhibit 1, the liquid portion of which is a sample of the imported natural fruit concentrate; plaintiff's illustrative exhibit 2, a sample of a concentrated soft drink preparation called Sinalco bottler's syrup, in which the imported concentrate is one of the ingredients, ready to be diluted with soda water and thus become a soft drink; and plaintiff's collective illustrative exhibit 3, two bottles of "Sinalco," the finished soft drink.

Mr. George F. Church, sole proprietor of the plaintiff company, testified that he was personally familiar with the imported product, stating in this connection as follows:

Q. Referring to that article, how did you become familiar with its nature and uses?—A. Well, I have known that the product was a concentrated fruit extract for the production of soft drink beverage and I became familiar with the product having been contacted by the company in Germany with a view of effecting distribution of the product in the United States.

Q. Is the soft drink made from Sinalco Seele in its condition before the Court, is that ultimate product a popular drink anywhere?—A. It is very popular in the countries in which it is bottled and distributed, which includes in excess of 70 countries throughout the world with the exception of the United States and Canada.

Q. Under what name is the beverage, the soft drink, distributed?—A. Under the name of Sinalco.

Q. Sinalco Seele?—A. Sinalco Seele refers to Sinalco, to the base of the extract. It is the base ingredient of the drink.

Mr. Church further testified that he had supervised and operated the process to produce the Sinalco drink from the ingredients, plaintiff's exhibit 1 (R.9). He described the production of the beverage in effect as follows: The Sinalco beverage is produced by first making a so-called bottler's syrup by dissolving sugar in a filtered water (the approximate sugar percentage being 60–63 percent). To the mixture of the sugar and water is added a given amount of citric acid solution. Then a very small amount of Sinalco Seele, the imported concentrate, is added, all of which is then mixed thoroughly, thus producing the combined concentration which is known as "Sinalco bottler's syrup" (R.10–11). (It appears from the record herein that the Sinalco Seele, the imported concentrate, constitutes about $1\frac{1}{4}$ percent of the bottler's syrup and that the citric acid, which is added to the sugar and water mixture, constitutes about $1\frac{3}{4}$ to 2 percent of the Sinalco bottler's syrup) (R.11). The Sinalco bottler's syrup is placed into bottles by

a bottling machine, in measured quantities, and then made into a commercial soft drink by the addition of carbonated water. The approximate percentage of the Sinalco bottler's syrup, in combination with the carbonated water, was stated to be about 1½ ounces of bottler's syrup to 8½ ounces of carbonated water (R.12).

The issue in the case at bar, as to the construction of the term "fit for beverage purposes," was the subject of a recent decision of this court in the case of *Heublein, Inc.* v. *United States*, 50 Cust. Ct. 118, C.D. 2398. The question involved in that case was whether certain apricot, raspberry, and strawberry natural fruit flavoring extracts, classified under paragraph 24 of the Tariff Act of 1930, as modified, as fruit flavoring extracts, assessed with duty at the rate of 7½ cents per pound and 9 per centum ad valorem, and, in addition, with an internal revenue tax of $10.50 per wine gallon, were "fit for beverage purposes," thus rendering them subject to the tax. The plaintiff therein, as here, contended that the merchandise there involved was not fit for beverage purposes. The testimony adduced on behalf of the plaintiff in the *Heublein* case, *supra*, tended to establish that the extracts in question were not fit for beverage purposes because without receiving certain treatment it would be most difficult, if not impossible, to produce a beverage that would be commercially acceptable; that the materials there imported were not fit for human consumption or use as a beverage in their imported condition; and that such products were deficient in sugar and acidity necessary to give them the proper taste and that the involved extracts were not potable. In support of its conclusion, this court in the *Heublein* case, *supra*, made reference to the holding of our appellate court in the case of *United States* v. *P. John Hanrahan, Inc., et al.*, 45 CCPA 120, C.A.D. 684.

In the *Hanrahan, Inc.*, case, *supra*, the involved merchandise consisted of certain gum gluten which was classified under paragraph 1558 of the Tariff Act of 1930 as articles, manufactured in whole or in part, not specially provided for, at the rate of 20 per centum ad valorem. Said paragraph 1558 of the act, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, and T.D. 52827, under which the plaintiff herein claimed the merchandise was properly dutiable at a reduced rate of 10 per centum ad valorem, excluded from its provisions such manufactured articles which were "edible preparations for human consumption." The question there at issue was, therefore, whether or not the merchandise in question was an "edible preparation for human consumption." The facts in the *Hanrahan* case, *supra*, showed that the merchandise therein was not eaten by itself as food in the form in which imported, but was added to wheat flour to produce a high protein mixture used

in bread and other dietetic foods. In holding that the merchandise in question was an edible preparation for human consumption and, accordingly, excluded from the benefits of the Presidential proclamation above referred to, T.D. 52739, our appellate court in the *Hanrahan* case, *supra*, page 124, stated:

> We find no reason for applying to the word "edible," as here under consideration, any meaning other than its common one which, in our opinion, embraces a preparation such as the instant merchandise, which is commonly used as an ingredient of foods and is prepared for that purpose. It is not necessary that the preparation should normally be eaten in the condition in which it is imported. It is, of course, true, as urged by appellee, that classification must be determined on the basis of the condition of the merchandise at the time of importation, but the instant merchandise, as imported, is capable of being eaten, and therefore is edible even though it must be mixed with other ingredients and cooked before the actual eating takes place.

In disposing of the issue in the *Heublein* case, *supra*, this court, at page 122, stated:

> The issue in the case at bar, as to the construction of the term "fit for beverage purposes," appears to be basically the same as that in the *Hanrahan* case, *supra*, where, as heretofore noted, the tariff term there being construed was "edible preparations for human consumption." As we construe the reasoning of our appellate court in the above-cited case, we are of opinion that, as applied to the merchandise in the case at bar, the term "fit for beverage purposes" embraces all preparations or ingredients which may ultimately be consumed as a beverage, even though such preparations must be mixed with other ingredients and subjected to processing or treatment before they can be used as a beverage, and we are further of opinion that the term in question is not limited to those products which are or can be consumed for beverage purposes in the form in which imported. The merchandise here involved meets the tests for a product "fit for beverage purposes." * * *

In our opinion, the reasoning of this court in the *Heublein* case, *supra*, and that of our appellate court in the *Hanrahan* case, *supra*, is equally applicable to the situation which obtains in the case at bar. We have here before us a product which "may ultimately be consumed as a beverage," even though the preparation "must be mixed with other ingredients and subjected to processing or treatment" before it can be used as a beverage. Further, as stated in the *Heublein* case, *supra*, we are of opinion that the term "fit for beverage purposes" is not limited to those products which are or can be consumed for beverage purposes *in the form in which imported*. While it may be true, as stated by plaintiff's witness, that the product in the condition in which imported has a very bitter taste and an adverse effect on a person who drinks the extract in its imported condition, nevertheless, the record shows that the product in question is used as an ingredient in the making of a beverage, and, as pointed out by our appellate court in the *Hanrahan* case, *supra*, "is capable of being

eaten," and is thus fit for beverage purposes within the meaning of that term employed in the applicable regulations. Accordingly, the assessment of the internal revenue tax here imposed under the provisions of the Internal Revenue Code was proper.

For the reasons stated aforesaid, we hold the involved merchandise properly classifiable as a fruit flavoring extract under paragraph 24 of the Tariff Act of 1930, as modified by the Torquay Protocol to the General Agreement on Tariffs and Trade, T.D. 52739, with duty assessment at the rate of 15 cents per pound and 9 per centum ad valorem. Plaintiff's claim that the involved merchandise is dutiable under paragraph 24 of the act, as modified, at rates of duty other than those at which the merchandise was assessed, is overruled. In addition, the merchandise is properly subject to internal revenue tax of $10.50 per wine gallon under the provisions of the Internal Revenue Code of 1954, as amended, as assessed. Further, the claim in this protest that the merchandise is not subject to internal revenue tax is overruled.

Judgment will issue accordingly.